## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**THOMAS MICHAEL MASSION,**

**Plaintiff,**

v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

**No. 15 C 7529**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Michael Massion filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, this case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff protectively applied for DIB on October 13, 2011, alleging that he became disabled on July 14, 2010, because of three degenerated disks in his lower back and de Quervain's tenosynovitis in his right wrist and arm. (R. at 18, 211). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 18, 77–93, 97–102). On July 19, 2013, Plaintiff, represented by counsel, testified at a video hearing before William Wenzel, an Administrative Law Judge (ALJ). (*Id.* at 18, 40–62). The ALJ also heard testimony from Gilberto Munoz, M.D., a medical expert (ME), and Pamela G. Tucker, a vocational expert (VE). (*Id.* at 18, 42–48, 62–75, 135, 137).

The ALJ denied Plaintiff's request for benefits on March 22, 2014. (R. at 18–30). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since July 14, 2010, the alleged onset date. (*Id.* at 20). At step two, the ALJ found that Plaintiff's history of low back and left leg pain, secondary to possible L3 radiculopathy, are severe impairments. (*Id.* at 20–21). The ALJ further found Plaintiff's right wrist pain and tenosynovitis to be a nonsevere impairment. (*Id.* at 21–22). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 22–24).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that he can perform light work, except that:

> [H]e is limited to frequent overhead reaching and no more than occasional handling and fingering with the right hand. [Plaintiff] is also limited to no more than occasional operation of foot controls on the left with occasional ability to crouch or climb. [Plaintiff] should avoid climbing ladders and scaffolds and should avoid work at unprotected heights. With regard to environmental limitations, [Plaintiff] should avoid vibrations and cold.

(R. at 24). At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (*Id.* at 29). Based upon Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including a call out clerk or an information clerk. (*Id.* at 29–30). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 30).

The Appeals Council denied Plaintiff's request for review on June 25, 2015. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'log-

ical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

In July 2010, Plaintiff presented to Antonio Baluga Jr., M.D., at MedChoice Medical Center with complaints of persistent low back pain for the past three to six months. (R. at 287). The pain had recently started radiating into his left lower extremities, with associated numbness and tingling. (*Id.*). Plaintiff reported his pain worsened with bending, lifting, and prolonged sitting. (*Id.*). Physical examination demonstrated abnormal lumbar range of motion, a positive left tripod test and a positive left Kemp's test, all with tingling down the left leg.[3] (*Id.*). Left straight leg raise (SLR) test was positive at 80 degrees,[4] and tenderness was noted over the left sciatic nerve. (*Id.*). An x-ray of the lumbar spine revealed minimal degenerative disc height narrowing at L4-L5 and minimal anterior endplate osteophyte superiorly at L4. (*Id.* at 291). Dr. Baluga diagnosed Plaintiff with degenerative disc disease,[5] and

---

[3] The tripod sign is an indication of nerve root tension in the lower extremities. K. Jeffrey Miller, D.C., *The slump test: clinical applications and interpretations*, Chiropractic Technique, Vol. 11 No. 4, November 1999. A Kemp's test assesses the lumbar spine facet joints. It is a provocative test to detect pain, including radicular pain. <http://www.physiopedia.com/KEMP_test>

[4] A positive SLR can be an indication of lumbar disc herniation, lumbar radiculopathy, and/or sciatica. <http://www.americanspinal.com/diagnosis-of-low-back-pain.html>

[5] "Degenerative disc disease is the label given wear on the spinal discs that can cause back pain radiating into the buttocks and upper thighs." *Schomas v. Colvin*, 732 F.3d 702, 704 (7th Cir. 2013) (citing Univ. of Md. Med. Ctr., Degenerative Disc Disease, http://umm.edu/programs/spine/health/guides/degenerative-disc-disease).

Plaintiff was referred to physical therapy for further evaluation and treatment. (*Id.* at 287, 291–92).

An MRI of the lumbar spine was performed on August 11, 2010, which revealed mild disc bulges without disc herniation at L1-L2 and L2-L3. (R. at 411). At L3-L4, there was a moderate diffuse disc bulge associated with bilateral broad-based protrusions. (*Id.*). The central canal was exposed, but there was "marginal displacement of the right L3 nerve root sleeve" and "an annular tear resulting in mild displacement of the left L3 nerve root sleeve." (*Id.*). The interpreting radiologist recommended clinical correlation for potential left L3 radiculopathy. (*Id.*).

Plaintiff attended physical therapy at MedChoice for approximately six months. (R. at 275–93, 330–40). The records reflect an improvement in Plaintiff's symptoms during the course of his therapy; however, his complaints of low back pain radiating down to his left foot and numbness and tingling in his left leg persisted throughout that time period. (*Id.* at 275, 278, 281, 284). Left SLR testing was noted to be positive upon each monthly re-evaluation. (*Id.* at 279, 282, 285, 284). On January 15, 2011, Dr. Baluga authorized Plaintiff to return to work with restrictions. (*Id.* at 415). For a period of four weeks, Plaintiff was restricted to (1) occasionally lifting 54 pounds, frequently lifting 27 pounds, and constantly lifting 11 pounds, and (2) no bending, reaching, twisting, or high impact activity. (*Id.*).

Plaintiff returned to work in February and March of 2011, where he began to develop symptoms of right arm and wrist pain. (R. at 51, 323–24). On April 22, 2011, Plaintiff sought treatment for these symptoms from Jason Davenport, M.D. at

Rockford Orthopedics, who diagnosed Plaintiff with de Quervain's tenosynovitis.[6] (*Id.* at 323–24). At Dr. Davenport's recommendation, Plaintiff began a course of physical therapy for this condition at Swedish American Orthopedic and Sports Therapy Center, where he completed approximately three months of therapy. (*Id.* at 341–404).

On September 22, 2011, Plaintiff presented to Ryan Enke, M.D. at Rockford Orthopedics with complaints of low back pain, the severity of which he rated as 3-7/10. (R. at 310). Plaintiff described the pain as shooting, dull, throbbing, and radiating down his left leg. (*Id.*). He also reported numbness and tingling in the left leg. (*Id.*). Upon physical examination, Dr. Enke noted mild left gluteal and piriformis tenderness, and -2 flexion,[7] extension, rotations and side bending with pain on flexion. (*Id.* at 310–11). Straight leg raising was positive at 30 degrees on the left. (*Id.*). Plaintiff demonstrated normal and symmetric strength, bulk, and tone in all major muscle groups of the bilateral lower extremities, as well as normal reflexes in the bilateral knees and ankles, downgoing toes bilaterally. (*Id.*). The sensory examination was normal, but with subjective tingling intermittently reported over the thighs. (*Id.* at 311).

---

[6] De Quervain's tenosynovitis occurs when the two tendons around the base of the thumb become swollen. The swelling causes the sheaths covering the tendons to become inflamed. This puts pressure on nearby nerves, causing pain and numbness. <http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238>

[7] A minus sign in front of a number is an indication of a deficiency. *Stedman's Medical Abbreviations, Acronyms & Symbols* A7 (5th ed. 2013).

Dr. Enke reviewed the August 2010 MRI, observing an L3-L4 disc protrusion with annular tear and impingement on L3 nerve roots. (R. at 311). Dr. Enke commented that clinically the distribution was more L4-L5, and that the MRI findings of L3 nerve root impingement typically should not cause pain in the lateral leg. (*Id.*). Dr. Enke nevertheless opined that Plaintiff's low back pain and left leg pain were suspicious for radiculopathy. (*Id.*). He assessed Plaintiff with radiculopathy, HNP, low back pain, and de Quervain's tenosynovitis.[8] (*Id.*). He did note that Plaintiff was "very focused on the disability aspect of this and has been off work for an extended period of time." (*Id.*). Dr. Enke prescribed Neurontin[9] and recommended a six-week course of physical therapy to improve function and further alleviate pain, with a focus on returning Plaintiff to work. (*Id.*).

Plaintiff returned to Dr. Enke on February 14, 2012, again with complaints of pain in his low back with radiation to the left leg, as well as intermittent numbness in his leg. (R. at 326). Plaintiff denied any muscle weakness, but reported that he experienced pain if sitting or standing for over 15 minutes. (*Id.*). The results of the physical examination were largely the same as the previous visit, although straight leg raise was now positive at 45 degrees on the left. (*Id.*). Dr. Enke again assessed

---

[8] Radiculopathy is a nerve disorder causing radiating pain. *See Hanson v. Colvin*, 760 F.3d 759, 760 (7th Cir. 2014); "Lumbar radiculopathy is chronic pain which occurs in the lower back and legs and is caused by compressed nerve roots." <http://mayoclinic.org/neurology/spinegroup.html> "HNP" is the abbreviation for herniated nucleus pulposus, "which is prolapse of an intervertebral disk through a tear in the surrounding annulus fibrosus." <http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders>

[9] Neurontin (gabapentin) is a medication that is often used to treat nerve pain in adults. <https://www.drugs.com/neurontin.html>

radiculopathy; noting, however, that Plaintiff's radicular pain did not "fit with classic L3 or L4 pattern as would be expected from MRI results." (*Id.* at 327). Plaintiff reported he was taking only over-the-counter analgesics as needed; he did not take Neurontin as prescribed due to loss of insurance. (*Id.* at 326). Plaintiff also reported he had been let go by his employer and had been denied disability. (*Id.*). Dr. Enke commented that Plaintiff was primarily interested in completing his disability paperwork and appealing the denied disability decision, and noted that Plaintiff did not follow-up as recommended after his September 2011 visit. (*Id.* at 327). At Plaintiff's request, Dr. Enke completed a disability questionnaire "to the best of [his] ability," given that he had seen Plaintiff on only two occasions. (*Id.*).

Dr. Enke opined that Plaintiff (1) could sit and stand for 15 minutes at a time, (2) could sit/stand/walk for 6 of 8 hours in a workday, (3) would require a position that permitted him to shift positions at will (i.e., a sit-stand option), (4) needs to walk for 90 minutes in a workday for 1 minute each time, (5) could lift and carry up to 20 pounds frequently and 50 pounds occasionally, (6) could occasionally twist, stoop, crouch/squat, and frequently climb stairs or ladders, (7) would not be off task during the workday, and (8) may require one unscheduled absence per month for his impairments. (R. at 407–09).

The ME testified that Plaintiff would be limited to light work. (R. at 66). He opined that Plaintiff (1) could occasionally lift 20 pounds and frequently lift 10 pounds, (2) could sit, stand, or walk six hours out of an eight-hour workday, (3) could reach overhead frequently and handle and finger with the right hand occa-

sionally, (4) could push and pull with the left leg occasionally, (5) could occasionally climb stairs, crouch, kneel, and crawl, (6) could not climb ladders, ropes or scaffolds or work at unprotected heights, and (7) should avoid work environments where there are significant vibrations. (*Id.* at 66–67).

Plaintiff testified that his conditions have deteriorated, causing him chronic pain. (R. at 51, 61). He reported that he has radiating pain in his lower back down into his left side. (*Id.* at 51–52). This causes him to spend his days shifting between sitting and standing positions in an attempt to alleviate his pain. (*Id.* at 61). He estimated that he can climb no more than three or four stairs without stopping to rest. (*Id.* at 52).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because (1) the ALJ failed to accord controlling weight to Plaintiff's treating orthopedist, and (2) the ALJ improperly formed "an inference" that Plaintiff was not disabled based upon his receipt of unemployment benefits. (Dkt. 18 at 9–15). Additionally, Plaintiff argues that this matter should be remanded due to the number of "inaudible" responses with regards to the ME's testimony. (*Id.*)

### A. The ALJ Did Not Properly Evaluate the Treating Physician's Opinion

Plaintiff asserts that the ALJ failed to accord controlling weight to Dr. Enke, Plaintiff's treating orthopedist,. (Dkt. 18 at 9–14). By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accord-

ed opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a nonexamining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1)) (other citation omitted).

The ALJ's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court court[ ] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002 (citations omitted). To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that he

considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citation omitted).

Dr. Enke diagnosed Plaintiff with radiculopathy, HNP, low back pain, and de Quervain's tenosynovitis. (R. at 311, 327, 406). He opined that Plaintiff (1) could sit and stand for 15 minutes at a time, (2) could sit/stand/walk for 6 of 8 hours in a workday, (3) would require a position that permitted him to shift positions at will (i.e., a sit-stand option), (4) needs to walk for 90 minutes in a workday for 1 minute each time, (5) could lift and carry up to 20 pounds frequently and 50 pounds occasionally, (6) could occasionally twist, stoop, crouch/squat, and frequently climb stairs or ladders, (7) would not be off task during the workday, and (8) may require one unscheduled absence per month for his impairments. (*Id*. at 407–09).

Although the ALJ noted that if Dr. Enke's assessment "could be viewed as valid and consistent with the total record, [Plaintiff] would appear to be disabled," the ALJ nevertheless rejected Dr. Enke's opinion for several reasons. (R. at 27). First, the ALJ noted that Dr. Enke's opinion was based on only two clinical examinations, in September 2011 and February 2012. (*Id*.). Second, the ALJ concluded that Dr. Enke's treatment notes were not consistent with his March 2012 assessment, "as most of the objective findings made on the two prior visits are within normal limits and inconsistent with a finding of radiculopathy." (*Id*.). Third, the ALJ concluded that "Dr. Enke reported himself that he was suspicious of [Plaintiff's] subjective symptoms and alleged radiculopathy because the location of the pain is not typical for an L3-L4 impairment and because [Plaintiff] is apparently focused primarily on

obtaining disability paperwork and not on creating and following through on a recommended treatment plan." (*Id.*). Fourth, the ALJ noted that Plaintiff's failure to follow up with Dr. Enke's treatment recommendations "suggests that [Plaintiff's] symptoms were not as severe as have otherwise been alleged." (*Id.*). Fifth, the ALJ noted that Dr. Enke relied on "old MRI evidence," which the ALJ found to be "unpersuasive seeing as how the MRI report itself mentions no evidence of a herniated disc and only mentions a probable annular tear." (*Id.* at 27–28). Finally, the ALJ concluded that "even if the RFC Questionnaire was deemed to be accurate it does not satisfy the 12 month continuous duration requirement" because Plaintiff's two visits to Dr. Enke were "separated by 5 months."[10] (*Id.* at 28).

As an initial matter, it was appropriate for the ALJ to afford Dr. Enke's opinion less weight because his assessment was based on only two clinical examinations. 20 C.F.R. § 404.1527(d). However, the remainder of the ALJ's analysis is legally insufficient and not supported by substantial evidence.

First, Dr. Enke's March 2012 assessment is not inconsistent with his clinical notes or the other medical evidence in the record. The ALJ concluded that most of the objective findings on both visits were "within normal limits" and therefore were "inconsistent with a finding of radiculopathy." (R. at 27). While Dr. Enke noted that Plaintiff's physical examination was "normal" in many respects, the ALJ ignored the abnormal findings that lend support to a diagnosis of radiculopathy, namely the

---

[10] The Commissioner acknowledges that this reason for discounting Dr. Enke's opinion is legal error. (Dkt. 21 at 8).

positive SLR test, pain on flexion, and left gluteal and lower paraspinal tenderness. (*Id.* at 310–11, 326); *see McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) (noting that decreased range of motion, paraspinal tenderness, and positive SLR are "clinical findings and objective signs" supportive of a diagnosis of radiculopathy). "An ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016); *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Thus, the fact that some of the objective findings were within normal limits does not undermine Dr. Enke's diagnosis or opinions as to Plaintiff's limitations.

Moreover, radiculopathy is not diagnosed based on physical examination alone.[11] Dr. Enke arrived at his diagnosis after considering Plaintiff's subjective reports, the physical examination, and the MRI evidence. The ALJ placed particular emphasis on the purportedly stale nature of the MRI evidence that Dr. Enke reviewed, finding the results unpersuasive because there was no evidence of a herniated disc. (R. at 27-28). However, a herniated disc is not the only cause of radiculopathy; nerve root compression can also be a cause. *See Schomas v. Colvin*, 732 F.3d 702, 704 (7th Cir.

---

[11] "The clinical diagnosis [of radiculopathy] is usually arrived at through a combination of the patient's history (including a description of the pain) and a physical exam. Imaging studies (MRI, CT-myelogram) are used to confirm the diagnosis and will typically show the impingement on the nerve root." <http://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy>; *see also* Karen Barr, M.D., *Electrodiagnosis of Lumbar Radiculopathy*, 24 Phys. Med. Rehab. Clin. N. Am. 79, 80 (2013) ("There is no gold standard for the diagnosis of lumbar radiculopathy. Therefore . . . a combination of history, physical examination, and imaging . . . is used to come to a diagnosis.").

2013) ("Lumbar radiculopathy is a painful condition of the nerve roots in the lower spine, often caused by disc herniation or compression."). Dr. Enke observed an L3-L4 disc protrusion with an annular tear and impingement on the L3 nerve roots. (*Id.* at 311, 326).

Furthermore, under the circumstances, the date of the MRI is not in and of itself a legally sufficient or medically sound basis for discounting the results or finding them "unpersuasive." There is no opinion testimony or other medical evidence to suggest that the results of a more recent MRI would have been different or shown any improvement in Plaintiff's condition. In fact, the results would likely have been just the opposite. It is well established that Plaintiff had been previously diagnosed with degenerative disc disease. (R. at 287, 291–92). The term "degenerative" implies that Plaintiff suffers from a condition that will get worse over time; "it is not one that will remain stable or improve." *Roddy*, 705 F.3d at 637 (*citing* Pablo R. Maizano & Carl Lauryssen, *Annual Repair and Barrier Technologies, in* The Lumbar Intervertebral Disc 113 (2009)).

Although the Court recognizes that the ALJ is entitled to considerable deference, such deference does not extend to his "playing doctor." *See Murphy*, 496 F.3d at 634 ("We have recognized that an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). And, to the extent that the ALJ was qualified to assess whether

Dr. Enke's objective findings were or were not consistent with radiculopathy, it is not readily apparent why the ALJ's own judgment should supplant Dr. Enke's medical judgment as both Plaintiff's treating physician and a specialist in his field, particularly in light of the fact that even the ME did not expressly disagree with Dr. Enke's diagnosis. *See Buechele v. Colvin*, No. 11 C 4348, 2013 WL 1200611, at *15 (N.D. Ill. March 25, 2013) ("To the extent that the ALJ was qualified to assess whether [the claimant's] MRIs or his EMG were or were not 'normal,' it is not clear why his judgment in that regard should supplant [the doctor's] medical judgment as [the claimant's] treating physician.").

The ME's testimony focused solely on whether or not Plaintiff met the requirements for Listing 1.04A and his opinion as to Plaintiff's RFC assessment. (R. at 42–48). Although the ME's opinions and the bases therefore are somewhat difficult to discern, as the transcript of the ME's testimony is riddled with "inaudibles," it is clear that the ALJ neither solicited an opinion from the ME regarding Dr. Enke's diagnosis nor did the ME offer one.

Additionally, Dr. Enke's opinions are not inconsistent with the other medical evidence in the record. Plaintiff underwent approximately six months of physical therapy at MedChoice in 2010. (R. at 275–91). Although he experienced an improvement in some of his symptoms during that course of treatment, Plaintiff consistently demonstrated a positive SLR, positive left tripod test, and decreased lumbar range of motion. (*Id.*). His complaints of low back pain radiating to the left buttock and left foot, as well as the numbness and tingling persisted throughout. (*Id.*).

Second, the ALJ misapprehended Dr. Enke's use of the term "suspicious" when referring to Plaintiff's low back and left leg pain. In his September 2011 progress note, Dr. Enke stated that Plaintiff had "low back pain and left leg pain suspicious for radiculopathy." (R. at 311). The ALJ's mistaken understanding of this medical evidence led him to the flawed conclusion that Dr. Enke "was suspicious of [Plaintiff's] subjective symptoms and alleged radiculopathy." (*Id*. at 27); *cf. Meuser*, 838 F.3d at 912–13 (The "ALJ's misunderstanding of the medical evidence led to a flawed finding that Meuser's testimony about the severity of his schizophrenia was 'not fully credible.' . . . But the credibility finding rests entirely on the ALJ's misunderstanding of the medical evidence. That foundation has collapsed, and with it the adverse credibility assessment."). However, Dr. Enke's comment that Plaintiff's symptoms were "suspicious for radiculopathy" does not mean that Dr. Enke was somehow doubtful of Plaintiff's complaints; rather, it is indicative of Dr. Enke's belief that radiculopathy could be an appropriate diagnosis based on Plaintiff's symptoms. Indeed, in the medical context, the term "suspicious" is defined as "referring to the consideration of a particular disorder."[12] Thus, the ALJ improperly played doctor when he ignored Dr. Enke's opinions to arrive at his own, incorrect interpretation of the medical evidence.

Dr. Enke did note that the MRI results "should not cause pain in the lateral leg typically," and that Plaintiff's "radicular pain does not fit with classic L3 or L4 pattern as would be expected from MRI results." (R. at 311, 327). However, these irreg-

---

[12] <http://medical-dictionary.thefreedictionary.com/suspicious>

ularities between Plaintiff's clinical presentation and the MRI evidence did not cause Dr. Enke to rule out radiculopathy. In fact, radiculopathy was Dr. Enke's primary diagnosis.

Even assuming, *arguendo*, that Dr. Enke did have some doubts about the validity of Plaintiff's subjective complaints, his opinions as to Plaintiff's disability and limitations nevertheless were not based upon those subjective complaints alone. If an opinion is "based *solely* on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). Here, Dr. Enke, an orthopedic specialist, had the opportunity to examine Plaintiff on two separate occasions in addition to reviewing the MRI evidence. A treating physician's ability to conduct his own examinations and testing is precisely one of the reasons his opinion is generally entitled to the most weight. *See Scott v. Colvin*, No. 14 C 6433, 2015 WL 6501143, at *2 (N.D. Ill. Oct. 27, 2015) ("One of the main reasons for the treating physician rule is that the treating physician's familiarity with the patient—and the nature and manifestation of the relevant condition—will allow the treating physician to accurately assess how that condition will affect the patient's ability to work."); *Estes v. Colvin*, No. 14 C 3377, 2016 WL 1446218, at *2 (N.D. Ill. Apr. 11, 2016) ("In general, the opinions of physicians who have examined the pa-

tient merit more weight than the opinions of physicians who have only reviewed a claimant's medical records or files.") (*citing Gudgel*, 345 F.3d at 470).

Moreover, almost all diagnoses require some consideration of the claimant's subjective symptoms, and here, Plaintiff's subjective statements were necessarily factored into Dr. Enke's analysis. *See McClinton*, 2012 WL 401030, at *11 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). Dr. Enke arrived at his diagnosis after considering Plaintiff's subjective complaints, the MRI evidence, and the results of his own testing and physical examination of Plaintiff.

Contrary to the ALJ's conclusion, Dr. Enke's comments regarding Plaintiff's focus on disability benefits or the inconsistencies between the MRI results and Plaintiff's clinical presentation do not equate to an expression of suspicion or disbelief regarding Plaintiff's subjective complaints. *See Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."); *see also McClinton*, 2012 WL 401030, at *12 ("[S]imply because [the plaintiff] was seeking disability and required such paperwork does not mean that the doctor's treatment was any less legitimate. The ALJ simply fails to explain how the completion of necessary paperwork for a patient, however frequent, mitigates the credibility or accuracy of a

treating doctor's medical opinion."). Here, the ALJ is attempting to read something into the record that is simply not there.

The ALJ also erred by using Plaintiff's failure to follow Dr. Enke's treatment recommendations as a basis to discount Dr. Enke's opinion without first inquiring into Plaintiff's reasons for his failure to pursue the recommended treatment plan. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Social Security Ruling (SSR) 96-7p,[13] which governed the ALJ's analysis at the time, made the issue at hand very clear: an ALJ should ordinarily not draw an adverse credibility inference because of lack of treatment unless the ALJ first seeks an explanation from the claimant. SSR 16-3p continues that directive in modified form.[14] It states that "[w]e will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, at *8. Thus, at the administrative hearing an ALJ may need to "ask why [the claim-

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

[14] The Social Security Administration has determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms. SSR 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching the claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

ant] has not complied with or sought treatment in a manner consistent with the degree of his or her complaints." SSR 16-3p, at *8. The ALJ made no such inquiries at the hearing.

Furthermore, the SSA has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment. *See* SSR 16-3p, at *9 ("An individual may not be able to afford treatment and may not have access to free or low-cost medical services."). Indeed, "claimants without health insurance are likely to delay medical treatment, even for serious conditions, because they fear the financial consequence of treatment." *Wendt v. Colvin*, No. 14 C 0910, 2015 WL 4730180, at *11 (N.D. Ill. Aug. 10, 2015) (*citing Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013)). Here, the record is replete with references to Plaintiff's loss of disability insurance the following month and his inability to afford further treatment as a result. (R. at 207, 215–16, 219–20, 258, 326–27, 406).

At his February 2012 visit, Plaintiff specifically reported to Dr. Enke that he was taking only over-the-counter pain medications; he was unable to take the Neurontin due to a loss of insurance, a fact that Dr. Enke noted on his March 2012 assessment. (R. at 326, 406). Additionally, Plaintiff testified regarding the loss of his job, his family's financial struggles and his frustration with being unable to provide for his wife and children. (*Id.* at 49–50, 58–59). Plaintiff's financial situation and concerns provide adequate justification as to his lack of medical treatment, as well as his focus on completing his disability paperwork at his appointments with Dr. Enke. As such, Plaintiff's failure to follow Dr. Enke's treatment plan should not have been

held against him unless the ALJ provided Plaintiff with an opportunity to offer explanations for his lack of treatment and had a valid basis for rejecting those explanations. *See Wendt*, 2015 WL 4730180, at *11 ("Without his workers [*sic*] compensation insurance, . . . Wendt had no readily available means of accessing health care, and his failure to seek treatment cannot be held against him because of the financial realities of his situation unless the ALJ had a valid basis for rejecting the explanations.").

Moreover, there is nothing in any of Plaintiff's prior medical records that would suggest Plaintiff would not have followed through with Dr. Enke's treatment plan had it not been for the loss of insurance. The only evidence of "noncompliance" with previous treatment recommendations can be found in the December 2010 MedChoice records, where it was recommended that Plaintiff continue with physical therapy. (R. at 286, 290). Plaintiff elected not to continue with the therapy at that time, explaining at the hearing that his short-term disability benefits ran out and he was faced with the decision of either returning to work or losing his job. (*Id.* at 49–50). The Seventh Circuit has recognized that a claimant will sometimes "be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003). The fact that Plaintiff chose to discontinue physical therapy and return to physical work rather than face the prospect of unemployment "does not demonstrate that he was medically capable of performing that work long term." *Estes*, 2016 WL 1446218, at *4; *see also Czarnecki v. Colvin*, 595 F. App'x 635, 644

(7th Cir. 2015) (A claimant "should not be penalized for *trying* to work through her pain.") (emphasis in original).

Although he was required to do so, the ALJ neither questioned Plaintiff about his lack of treatment and medicine noncompliance, nor did he consider any of the other evidence in the record reflecting Plaintiff's loss of insurance and inability to pay for further treatment and medication. *See* SSR 16-3p, at *8–9. Instead, the ALJ improperly drew a negative inference as to Plaintiff's credibility and the credibility of Dr. Enke's report based upon Plaintiff's failure to follow the recommended treatment plan. *See Craft,* 539 F.3d at 679 ("Here, although the ALJ drew a negative inference as to [the plaintiff's] credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that [the plaintiff] had reported an inability to pay for regular treatment and medicine.").

In sum, the ALJ provides no "good reasons" for discounting the treating physician's opinion. The ALJ failed to build a "logical bridge" between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). This prevents the Court from assessing the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Enke's opinion. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "con-

sider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinion.

## B. Other Issues

Because the Court is remanding to reevaluate the weight to be given to the treating physician's opinion, the Court chooses not to address Plaintiff's other arguments that the ALJ's adverse credibility determination was the product of legal error or that the matter must be remanded because the transcript of the ME's testimony includes multiple "inaudible" entries. However, on remand, after determining the weight to be given the treating physician's opinion, the ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [17] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is

reversed, and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

ENTER:

Dated: November 14, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge